<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**

JAMES J. WALDRON, CLERK

[May 7, 2009]

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: <u>Elizabeth Grassia</u>, Deputy

|  |  |  |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
|  | : |  |
| TORGRO ATLANTIC CITY, LLC, | : | CASE NO.  08-13458 (GMB) |
|  | : |  |
| Debtor. | : | <u>O P I N I O N</u> |
|  | : |  |

APPEARANCES:        Andrea Dobin, Esquire
Graig P. Corveleyn, Esquire
STERNS & WEINROTH
50 West State Street, Suite 1400
P.O. Box 1298
Trenton, NJ 08607
Counsel for Torgro Atlantic City, LLC

Jeffrey M. Sponder, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
One Newark Center, Suite 2100
Newark. NJ 07102

Joel L. Schwartz, Esquire
Law Office of Joel L. Schwartz, Esquire
333 Tilton Road
Northfield, NJ 08225
Counsel for Jonathan's Transportation Service, Inc.

Brian S. Behar, Esquire
2999 N.E. 191st Street
Fifth Floor
Adventura, FL 33180
Counsel for Lease Acceptance Corp.

Before the Court for confirmation is the First Modified Chapter 11 Small Business Plan (the "First Modified Plan") of Torgro Atlantic City, LLC (the "Debtor").  The Office of the United States Trustee (the "U.S. Trustee"), Lease Acceptance Corporation ("Lease Acceptance"), and Jonathon's Transportation Services, Inc. ("Jonathon's Transport") have objected to the Plan.  Confirmation hearings were held on January 19, 2009 and February 19, 2009, and the Court allowed supplemental certifications and briefs from the parties after each hearing.  This decision will focus on whether: (1) the Debtor's proposed Plan is feasible; (2) the Debtor's classification of creditors in its Chapter 11 Plan is reasonable; and (3) the Debtor's principal's new capital contribution complies with the requirements of the "new value" exception to the absolute priority rule.

On April 8, 2009, weeks after the record of the confirmation hearing was closed, the Debtor filed a motion for an order to allow untimely voting ballots to be filed for several creditors from the proposed Class A and to consider them in its decision.  The Court held a hearing on April 27, 2009 regarding the motion.  This decision will also address the Court's determination regarding the filing of the untimely voting ballots.

I.    **JURISDICTION**

This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1334(a), 157(a), and the Standing Order of the United States District Court for the District of New Jersey dated July 23, 1984, referring all bankruptcy cases to the bankruptcy court.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409.  The following shall constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Debtor is a limousine and transportation service provider for both casino patrons and non-casino events such as weddings, proms, business outings, and airport transportation in the New Jersey and Pennsylvania areas.  In December of 2006, Harrah's Entertainment, Inc. ("Harrah's"), an entity that owns four casino properties in Atlantic City, New Jersey, signed a contract with the Debtor ("Harrah's Contract") that will run until December of 2010.  The Harrah's Contract granted the Debtor an exclusive right of first refusal for all transportation trips of Harrah's casino patrons that begin or end at one of the Harrah's properties, and the transportation of Harrah's patrons comprises the majority of the Debtor's business.  John Groff, Sr. ("Groff, Sr.") is the sole member of the Debtor, and John Groff, Jr. ("Groff, Jr.") is the office manager of the Debtor.  Additionally, Groff, Sr. is an interest holder in the related entities Torgro Limousine Services, Inc. ("Torgro Limo"), Torgro, Inc., a Philadelphia, Pennsylvania based operation, and Torgro Yellow Cab Company, Inc. ("Torgro Cab"), all of which are limousine and/or transportation service providers.

On September 20, 2006, the Debtor agreed to purchase the assets of Jonathon's Transportation Services, Inc. ("Jonathon's Transport").  In consideration for the purchase, the Debtor executed a promissory note (the "Note") for $20,000 and agreed to purchase vehicles (the "Vehicles") for $80,000, both of which were to be paid off by the Debtor on a monthly basis. Because the Debtor failed to remit various payments (e.g. rent, payments on the Note and Vehicles, etc.), Jonathon's Transport instituted an action against the Debtor in the Superior Court of New Jersey, Chancery Division, before the Honorable William C. Todd III.  Pursuant to Judge Todd's order dated March 16, 2007, the Debtor was to continue to deposit payments into its attorney's trust account until further ordered by the state court.  On January 30, 2008, Judge

Todd entered a judgment in favor Jonathon's Transport and against the Debtor, finding: (1) that

the Debtor remained responsible for payments on the Note and the Vehicles, (2) that the

damages due to Jonathon's Transport for breach of the September 20, 2006 agreement totaled

$162,722, (3) that all payments toward the Note and Vehicles, which were previously escrowed,

were to be paid to Jonathon's Transport, and (4) that payment of the entire judgment amount was

to be made to Jonathon's Transport on or before February 28, 2008.

On February 28, 2008, the Debtor filed for voluntary relief under Chapter 11.  The U.S.

Trustee filed a motion to convert the case from Chapter 11 to Chapter 7 on May 23, 2008, citing

concerns of negative cash flow and continuing diminution of the bankruptcy estate with

rehabilitation of the Debtor unlikely.  This motion has not been decided by the Court as the U.S.

Trustee has sought continuance of this motion, which has been granted.

On September 19, 2008, the Debtor filed a Chapter 11 Small Business Disclosure

Statement ("Disclosure Statement") and Plan ("Plan"), which contemplated partial funding from

the funds held in escrow by the March 16, 2007 state court order as well as funding from

continued operation.  On September 23, 2008, Jonathon's Transport filed a motion for the

Debtor to turnover the funds held in escrow as ordered by Judge Todd, and on October 2, 2008,

filed an objection to confirmation of the Debtor's Plan.  The Court, on October 22, 2008, granted

the turnover motion of Jonathon's Transport and adjourned the Debtor's Disclosure Statement

hearing to allow the Debtor to file an amended disclosure statement and an amended plan.

The Debtor filed its First Modified Chapter 11 Small Business Disclosure Statement

("First Modified Disclosure Statement") and First Modified Plan on November 12, 2008.  The

Court approved the Debtor's First Modified Disclosure Statement on November 17, 2008.  In an

order entered on November 21, 2008, the Court set out the deadlines for voting on the Debtor's

First Modified Plan.  The voting deadline was set for December 15, 2008.

Torgro Limo filed a Chapter 11 petition on November 20, 2008.  In the petition, Torgro

Limo's name is misspelled as "Trogro Limousine Service, Inc."  The cases are not being jointly

administered.  The U.S. Trustee filed a motion on shortened time to convert the Torgro Limo

case to Chapter 7, and Torgro Limo filed no objection.  The conversion of Torgro Limo's

Chapter 11 case to Chapter 7 was granted on February 9, 2009.

Below is a brief description of the Debtor's First Modified Plan.  The First Modified Plan

proposes that the Debtor will assume the Harrah's Contract, the contract between Lease

Acceptance and the Debtor through which the Debtor retains a leased vehicle, and the

intercompany agreements between the Debtor, Torgro Limo, and Torgro, Inc.  Under the First

Modified Plan, the estimated administrative claims total approximately $143,000.  On the date of

confirmation, the Debtor plans to pay approximately $66,000 toward the administrative claims

and asserts that the parties holding administrative claims that are not paid in full on that date

have agreed to accept monthly payments over a twenty-four month period until they are fully

compensated.

As to the unsecured nonpriority creditors ("unsecured creditors"), the First Modified Plan

classifies these creditors into four classes: (A) trade creditors holding claims that arose through

the Debtor's ordinary business operations and with whom the Debtor continues to or wishes to

continue to do business with in the future; (B) trade creditors holding claims that arose through

the Debtor's business operations but are not related to the Debtor's ordinary business operations,

and with whom the Debtor does not foresee continuing business with; (C) creditors holding

claims that arose through litigation between the Debtor and the creditor, that are not trade

related, and with whom the Debtor is a direct competitor; and (D) creditors that are insiders,

such as the Debtor's sole member or companies for which the Debtor's sole member holds

ownership interest, and whom have intercompany loans with the Debtor.  Class A includes

Absecon Service Station, Inc. ("Absecon Shell"), Arron's Bayside Limousines, Lease

Acceptance, Karu, Inc. t/a Tropical Limousine, Odyssey Limousine ("Odyssey"), Riggins, Inc.,

and Supreme Limousine.  Class B includes Dagmun Ruvim, Maksim Voicechovskij, ERSA

Court Reporters, and Slotnick & Schwartz.  The creditors in Class C are John Paone and

Jonathon's Transport.  And, Class D creditors are Torgro Limo and Torgro Cab.  With the

exclusion of Class D, each class of unsecured creditors receives the same treatment and is

scheduled to receive quarterly payments over the five-year life of the First Modified Plan, which

will total approximately a 10% payment of the debt owed to the unsecured creditor.  The

unsecured creditors, again excluding Class D, may also receive additional funds if the Debtor

recovers any funds through its ongoing litigation efforts.

According to the First Modified Plan, Groff, Sr. intends to remain the Debtor's sole

member through his proposed new capital contribution of approximately $61,000, which will

pay the necessary administrative claims on the date of confirmation.  Torgro, Inc. and Torgro

Limo are to contribute in the aggregate $5,000 to the Debtor's First Modified Plan. The Debtor

proposes that the unsecured creditors' payments will be funded through the Debtor's future

business operations.  Finally, the Debtor asserts that it is a plaintiff in several ongoing litigations

and proposes that two-thirds of any funds recovered from the litigations will be distributed to the

Debtor's creditors by priority, as set out in the Bankruptcy Code, until the creditors are fully

compensated.

The voting results of the Debtor's First Modified Plan were filed with the Court on December 16, 2008.  Class A rejected the First Modified Plan.  Class B accepted with only one creditor voting, Slotnick & Schwartz, a law firm with a claim for legal services regarding the Debtor's state court litigation with Jonathon's Transport.  Class C, John Paone and Jonathon's Transport, rejected the First Modified Plan.

On December 17, 2008, the Debtor filed, on shortened time, a motion to extend time for the confirmation of the Debtor's First Modified Plan pursuant to 11 U.S.C. § 1121(e), which was granted on December 23, 2008, extending the time for confirmation until January 31, 2009.  The Court has continued to extend the time for confirmation of the First Modified Plan to complete this confirmation hearing.

Both the U.S. Trustee and Lease Acceptance filed objections to the Debtor's First Modified Plan.

On January 28, 2009, the Court held a confirmation hearing regarding the Debtor's First Modified Plan.  Groff, Jr. testified for the Debtors, stating that the Debtor has between 20-25 full-time employees, that the Debtor has one leased vehicle of its own and uses other vehicles from Torgro Limo and Torgro, Inc., and that he does not know whether written agreements existed between the companies.  Groff, Jr. also testified that he believes the Debtor's business will expand to include transportation outside the casino industry such as medical transport and that the Debtor is now operating out of a private residence because it is in the process of relocating to a less expensive rental unit.  He further testified that the Debtor was not meeting its projections because the economy was down and that although Torgro Limo, which is in Chapter 11, was not profitable (now converted to Chapter 7) and the Debtor leased many of its vehicles from Torgro Limo, Torgro Limo's bankruptcy filing would have no effect on the Debtor.

7

Furthermore, the Debtor's bookkeeper, Amarita Manual, who was hired in August of 2008 testified in regard to the Debtor's general business operations, asserting that 80% of the Debtor's business comes from the Harrah's Contract, 5% comes from house accounts (businesses or people that order a vehicle and driver for transportation and that the Debtor bills at a later date), 5% comes from trips to and from the airport, 5% comes from instant business (one time users), and 5% comes from events such as weddings, funerals, and proms.  When asked about discrepancies in the monthly operating reports regarding the Debtor's monthly payroll, the bookkeeper explained that employees are paid every two weeks for services performed and that the subcontractors' billings and payments may be in a different month from when services are rendered – an answer that did not adequately explain the discrepancies.  The bookkeeper did not know the amounts paid to subcontractors but indicated that the Debtor made little profit from subcontractors as opposed to employee drivers.  She did state that the Debtor has reduced business costs by cutting its work force and changing employee arrangements. Finally, the bookkeeper testified that: (1) she worked for Torgro Limo and Torgro, Inc. as well as the Debtor; (2)  when she started working for the Debtor, its bills, Torgro Limo's bills, and Torgro Inc.'s bills were mixed together; (3) the Debtor, Torgro Limo, and Torgro, Inc. have separate business accounts and that the Debtor pays Torgro Limo and Torgro, Inc. for use of their vehicles as if those entities are subcontractors; and (4) her place of employment with the Debtor is now located at a private residence.

At the conclusion of the January 28, 2009 hearing, the Court requested that the Debtor provide supplemental certifications regarding the First Modified Plan's feasibility before the subsequent confirmation hearing date.  On February 12, 2009, the Debtor filed a brief in further support of confirmation, a supplemental certification of Groff, Sr., a supplemental certification

of Groff, Jr., additional payroll information, the agreement between the Debtor and Torgro, Inc.,

a list of the vehicles at Torgro, Inc.'s disposal, a certification of the Debtor's accountant, trends

and statistics surrounding the Atlantic City Casino Industry, and additional trends and

projections of the Debtor's business.

The agreement between Torgro, Inc. and the Debtor is titled "Agreement between

Torgro, Inc. and Torgro Atlantic City, LLC," but the language of the agreement states that the

agreement was "entered into as of this 2nd day of January 2007 by and between Torgro

Limousine, Inc. ('Provider') at and Torgro Atlantic City, LLC, ('Operator')."  The agreement was

signed twice by Groff, Sr. – once as the President of Torgro, Inc. and once as the sole member of

the Debtor.  The agreement provides that the Operator shall be responsible for the vehicles used

as follows:

>    a.    All lease, purchases or financing payments
>    b.    All insurance premiums as required
>    c.    All licensing fees as necessary
>    d.    All maintenance and repairs
>    e.    All fuel, tolls and other costs incident to operations.

As to compensation for performing services, the agreement provides that the Operator will pay:

>    a.    One Dollar [] for the first two years of the Agreement of the term, and
>    b.    For year three, two percent [] of the Operator's gross annual revenue due on the
>          year end closing of the Operator's accounts, and
>    c.    For year four, three percent [] of the Operator's gross revenue due on the year end
>          closing of the Operator's accounts, and
>    d.    For year five and all succeeding years[,] five percent (4%) [sic] of the Operator's
>          gross annual revenue due on the year end closing of the Operator's accounts.

Further, in the Debtor's supplemental brief and Groff, Jr.'s supplemental certification, the

Debtor clarifies its payroll procedures, the types of employees the Debtor uses to generate

revenue, and the method by which each type of employee is paid.  The Debtor asserts, without

any support, that it has access to approximately 100 vehicles because of its relationship with

subcontractors.  Groff, Jr. asserts in his supplemental certification that the Debtor has increased

its use of independent contractors and subcontractors because of the Debtor's reduction of

employees and that the Debtor makes an easier but smaller profit using the subcontractors since

the Debtor is not required to provide a vehicle.  Further, the Debtor also asserts that, through the

negotiation with administrative creditors, $10,000 of  Groff, Sr.'s $66,000 capital contribution is

now being allotted as an up front payment for unsecured creditors, resulting in smaller future

payments to the unsecured creditors from the Debtor.

On February 17, 2009, the Debtor filed a notice of rejection for the Lease Acceptance

lease, leaving the Debtor with no vehicles of its own for the Debtor's operation.  This rejection

of the lease is a modification of the First Modified Plan.

At the February 19, 2009 hearing, Groff, Jr. again took the stand, testifying that the

liquidation of Torgro Limo will not effect the feasibility of the First Modified Plan because the

Debtor can use Torgro, Inc.'s vehicles, which are insured separately from Torgro Limo's, and

that the Debtor terminated the use of Torgro Limo's vehicles several days prior to the hearing.

He offered no documentary support for these assertions.  Groff, Jr. was still unable to adequately

testify about the Debtor's employees, payroll, and the intercompany agreements.  Regarding the

Harrah's Contract, Groff, Jr. testified that the contract ran until 2010 and that, once the contract

was at an end, the contract could be extended in one year increments.  Again, he offered no

evidence of the viability of such an extension or an alternative business course if the contract

was not extended even though the Harrah's Contract represents 80% of the Debtor's business.

Groff, Jr. also testified that the Debtor only possessed a temporary license to provide casino

services, despite having applied for the license in January of 2007, and that he did not believe

that his guilty plea regarding insurance fraud was the reason for the licensing delay.  He further

stated that the Debtor had not been contacted regarding problems with the application and that

the application process usually took three to four years.  No support for these assertions was

presented.  Groff, Jr. also stated that Groff, Sr. and Groff, Jr. do not collect salaries from the

operations of the Debtor and that its dispatch office will continue to be located at a private

residence thereby saving the Debtor the cost of rent.

Groff, Sr. testified regarding his capital contribution to the Debtor, asserting that he

refinanced his property, receiving $57,000, and will receive $9,000 from his daughter; therefore,

a total of $66,000 cash exists to contribute as capital to the Debtor.

The Debtor's accountant, Donna Miller, C.P.A., testified at the confirmation hearing

regarding the Debtor's projections for operations and the financial viability of the business.  The

accountant testified that: (1) although the Debtor did not meet the September, October,

November, and December projections, the Debtor continued to survive through instituting cost-

cutting measures, such as reducing employees; (2) the Debtor is and has been negatively

impacted by the decline in the Atlantic City Casino Industry; (3) she is assuming that the fall of

2008 was the worst point in the Debtor's economic decline without support for such an

assumption; (4) the Debtor needs revenue of $70,000 to $75,000 a month to operate without a

loss for the month; and (5) 50% of the Debtor's employees should be subcontractors for the

business to operate.  Additionally, the accountant testified that she used the Debtor's 2007

financial information to make her projections, and with her projections of a conservative 5%

yearly increase in the Debtor's revenue, the Debtor should be able to meet the future plan

payments and have cash to spare.  The accountant did admit that these projections were made

without accounting for any contractual relationships that may cease to exist between the Debtor

and any third parties within the projected periods.

11

In support of the objection of Jonathon's Transport to the Debtor's First Modified Plan, Jon Paone, a principal of Jonathon's Transport, testified that he voted against and objects to the Debtor's reorganization because he does not believe that he will be paid.

After the February 19, 2009 hearing, the Court voiced its concerns regarding the reasonableness of the separate classification of the seemingly similar unsecured claims and allowed the parties to file supplemental briefs regarding this issue. On March 13, 2009, both the Debtor and Jonathon's Transport filed supplemental briefs.

On April 8, 2009, after the close of the Debtor's First Modified Plan's confirmation hearing, the Debtor filed a motion for an order to allow untimely filed voting ballots. The Debtor filed supplemental certifications from Odyssey and Absecon Shell supporting the Debtor's motion to allow the untimely ballots. Jonathon's Transport filed an objection to the Debtor's motion. The Court held a hearing on April 27, 2009 regarding the Debtor's motion to allow the untimely ballots and advised the parties that it would consider the matter in conjunction with its confirmation decision.

The U.S. Trustee filed a supplemental objection to the confirmation of the Debtor's First Modified Plan on April 24, 2009.

## III.    DISCUSSION

Since the Court is reviewing whether the Debtor's First Modified Plan is confirmable, the Court will briefly address the ways in which a Chapter 11 plan can be confirmed and then will address the specific issues raised by the Court and the parties regarding the Debtor's confirmation. As explained by the Third Circuit Court of Appeals, 11 U.S.C. § 1129 provides two ways for a proposed Chapter 11 plan to be confirmed. John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc., 987 F.2d 154, 157 (3d Cir. 1993). "The first requires approval [of

the proposed plan] by all impaired classes." Id.  For an impaired class "[t]o accept the Plan, class

members holding at least fifty percent of the number of claims and two-thirds of the amount of

the claims would need to vote for the Plan.  In re Armstrong World Indus., Inc., 432 F.3d 507,

510 (3d Cir. 2005) (citing 11 U.S.C. § 1126(c)).  "If the plan is not consensual, [accepted by all

impaired classes as required by section 1129(a)(8),] a court may still confirm as long as the plan

meets the other requirements of section 1129(a), [including the requirement that the plan be

accepted by at least one impaired creditors' class pursuant to 11 U.S.C. § 1129(a)(10),] and 'does

not discriminate unfairly, and is fair and equitable' as to any dissenting impaired class."

Armstrong World Indus., 432 F.3d at 511-12 (quoting 11 U.S.C. § 1129(b)(1) and citing Bank of

Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441 (1999)).  This

second "type of confirmation is [] called a 'cram down,' as the court can cram a plan down over

the objection of an impaired class."  Id.  "[T]he 'fair and equitable' requirement for a cram down

[] invokes the absolute priority rule."  Id.  As codified in 11 U.S.C. § 1129(b)(2)(B)(ii), the

absolute priority rule requires that "a dissenting class of unsecured creditors must be provided

for in full before any junior class can receive or retain any property [under a reorganization]

plan." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988) (quotation marks and

citations omitted).  "Consequently, whether or not a plan will be confirmed [can] depend[] on

how the claims . . . are classified."  In re Fairfield Executive Assoc., 161 B.R. 595, 600 (D.N.J.

1993).

 Here, according to the Debtor's First Modified Plan's classification scheme, Classes A

and C are impaired classes that rejected the Debtor's First Modified Plan.  Because the First

Modified Plan was not accepted by every impaired class of claims, it does not satisfy the

requirements of § 1129(a)(8); therefore, the Debtor will have to cram down its First Modified

Plan over the classes' objections.  The First Modified Plan will still have to comply with the

other requirements of § 1129(a) and will have to meet the requirements of § 1129(b).  Here, the

Court will address whether: (1) the Debtor's proposed Plan is feasible pursuant to § 1129(a)(11);

(2) the Debtor's classification of creditors in its First Modified Plan is reasonable; and (3) the

Debtor's principal's retention of his ownership interest in the reorganized Debtor is barred by the

absolute priority rule.

**A.**    **The Court Does Not Find that the Debtor's First Modified Plan Is Feasible; Therefore, the First Modified Plan Cannot Be Confirmed.**

For a Chapter 11 plan to be confirmable, the requirement of 11 U.S.C § 1129(a)(11) must

be met.  Section 1129(a)(11) mandates that the plan's proponent must show that "[c]onfirmation

of the plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  "The purpose of

§ 1129(a)(11) 'is to prevent confirmation of visionary schemes that promise creditors and equity

security holders more under a proposed plan than the debtor could possibly attain after

confirmation.'"  In re Sound Radio, Inc., 103 B.R. 521, 522 (D.N.J. 1989), aff'd without opinion,

908 F.2d 964 (3d Cir. 1990) (citation omitted).  Courts have listed several factors to consider

during a Chapter 11 plan's feasibility determination, including:

> (1)  the adequacy of the debtor's capital structure;
> (2)  the earning power of its business;
> (3)  economic conditions;
> (4)  the ability of the debtor's management;
> (5)  the probability of the continuation of the same management; and
> (6)  any other related matters which determine the prospects of a sufficiently
>       successful operation to enable performance of the provisions of the plan.

In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing In re

Temple Zion, 125 B.R. 910, 915 (Bankr. E.D.Pa. 1991); In re Landmark at Plaza Park, Ltd., 7

B.R. 653, 659 (Bankr. D.N.J. 1980)).  Further, "'proof of feasibility is an easier task when payouts [to creditors] are done over shorter periods of time [because, t]he longer the debtor proposes a payout, the more difficult it may become to prove distant ability to service debts.'" In re Rack Eng'g Co., 200 B.R. 302, 306 (Bankr. W.D.Pa. 1996).

The U.S. Trustee has objected to the Debtor's First Modified Plan, asserting that the First Modified Plan is not feasible pursuant to 11 U.S.C. § 1129(a)(11) because: (1) the Debtor has not provided sufficient evidence that Groff, Sr. will be able to make the proposed capital infusion; (2) the Debtor's October 2008 monthly operating report shows a negative cash flow, thus further operating reports need to be filed for a feasibility determination to be rendered; and (3) the Debtor's sales have dropped since the filing of its bankruptcy petition, as such, the Debtor's projections may not be reliable.

In its February 12, 2009 supplemental brief, the Debtor addressed the feasibility issues raised by the Court and the U.S. Trustee, arguing that: (1) although Torgro Limo's Chapter 11 case has been converted to Chapter 7, the Debtor will continue to survive by using Torgro, Inc.'s leased vehicles, a fleet of fifteen vehicles, pursuant to the agreement between the Debtor and Torgro, Inc., and this agreement can support the Debtor's business needs; (2) since Torgro, Inc. will be able to make payments for the vehicles, the vehicles' expenses, and the vehicles' insurance through the Debtor's compensation to Torgro, Inc. for the vehicles used by the Debtor, Torgro, Inc. will be able to continue to provide the vehicles for the Debtor's business needs; and (3) the projections of the Debtor's future operation, ascertained through a review of the Debtor's 2007 financial information and a comparison of the Debtor's decline in business with the decline in the Atlantic City Casino Industry's business, establishes that the Debtor's future profit margin

will allow for the Debtor to make its required plan payments to unsecured creditors, scheduled

payments to administrative creditors, and leave excess funds for the Debtors.

Here, the Debtor has not met the burden of proving that the First Modified Plan is

feasible.  In reviewing the factors used by courts for feasibility determinations, the Court finds

that the first factor does not weigh in favor of the feasibility because the only information

provided by the Debtor regarding its capital structure, information located in its First Modified

Plan, shows that the Debtor has no assets, leaving the Debtor with a capital structure comprised

solely of debt.

As to the earning power of the reorganized Debtor, the projections and testimony

regarding the Debtor's future operations do not support a finding of feasibility because the

Debtor has no vehicles of its own to support its business, Torgro Limo's vehicles are no longer

at the Debtor's disposal, and the Court is not persuaded by the testimony presented that the use

of Torgro Inc.'s vehicles and other subcontractors will be enough to support the Debtor's

business operations and projections.  Even if the agreement between Torgro, Inc. and the Debtor

provides sufficient vehicles for the Debtor's business use, the Debtor is now in the third year of

its agreement with Torgro, Inc., which allows for an increase of compensation to Torgro, Inc.

from the Debtor, and the Debtor has not explained how this increased compensation to Torgro,

Inc. will affect its earning power.  Additionally, the Debtor's projections for operations, as

explained by the Debtor's accountant, do not address whether the Debtor will be able to maintain

the projected operations if the Harrah's Contract, which accounts for 80% of the Debtor's

business, is not renew after the contract's 2010 end date.  Groff, Jr. did testify that the Debtor is

attempting to expand the business outside the casino industry, but the Debtor did not provide

evidence that this attempt was anything more than a visionary scheme.  Furthermore, the Debtor

has already halted payment of Groff, Sr. and Groff, Jr.'s salaries, is not paying rent to operate

because its dispatch office is currently located at a private residence, and has cut staffing to

reduce costs.  Even with these cost saving measures in place, the Debtor has not met the

projections of September, October, November, and December of 2008.  Without evidence of

new viable business opportunities for the Debtor outside or inside the casino industry or the

Debtor's capability of meeting the contractual increase of compensation to Torgro, Inc., the

earning power of the Debtor does not weigh in favor of a positive feasibility determination.

      The current economic conditions do not weigh in favor of a finding that the First

Modified Plan is feasible.  The Debtor provided the Court with statistics and trends of the

Atlantic City Casino Industry, which show a significant downturn in the casino industry's

business.  As would be expected, the Debtor's operations are tied to the casino industry's failure

or success, and the Debtor has also experienced a significant decline in business.  Although it is

difficult to determine with certainty whether these economic conditions will continue for an

extended period, the Debtor, in using the accountant's projections that assume the Fall of 2008 as

the bottom of the decline, has not accounted for and has not presented a strategy for the

possibility that business will continue to decline.  The present economic conditions could

continue for the next year or the next several years, and yet the Debtor presents projections that

show a 5% yearly increase in revenue; therefore, the third factor does not weigh in favor of a

positive feasibility determination.

      The ability of the Debtor's management and the probability of the continuation of the

same management also do not weigh in favor of a finding of feasibility.  Groff, Jr. is currently

the office manager of the Debtor and the son of Groff, Sr., who is the sole member of the Debtor,

indicating a high probability of the continuation of the same management. Groff, Jr. was the

office manager of the Debtor pre-petition and has remained the office manager throughout the
bankruptcy proceeding.  The Debtor has continuously not met its monthly projections since its
Chapter 11 filing.  Groff, Jr., through his testimony, did not seem to have sufficient knowledge
of the operation of the Debtor's business.  For example, Groff, Jr. was unable to adequately
testify as to how many employees the Debtor employed and to explain the payroll numbers for
October and November of 2008, stating that the bookkeeper or the accountant would have
knowledge of the answers.  Groff, Jr. did describe his intent to expand the Debtor's operations to
provide transportation services to businesses outside the casino industry, but he did not seem to
have a structured method for implementing this intent.  Because the Debtor's manager does not
seem to have a sufficient grasp of the Debtor's operation and the management now in place will
probably continue, the fourth and fifth factors do not weigh in favor of feasibility of the First
Modified Plan.

Finally, since the Debtor proposes to make quarterly payments to unsecured creditors
over an extended period of time, the Debtor's long-term ability to operate must be reviewed.
The long-term viability of the Debtor's operation is linked to the continued operation of Torgro,
Inc., the company that provides the Debtor vehicles, the Atlantic City Casino Industry's increase
in business, the economic conditions of the areas the Debtor services, and the Debtor's capability
to expand its business to include non-casino transportation services.  The Debtor has not
provided evidence of the long-term viability of any of these necessary conditions, thus the Court
cannot find that the Debtor has the capability of operating long enough to make all of its
scheduled future payments to unsecured creditors.  Because the factors used by courts to
determine a plan's feasibility do not weigh in favor of the Debtor's First Modified Plan's
feasibility, and the Court does not conclude that the Debtor has demonstrated the ability to

operate long-term, the Court finds that the First Modified Plan does not comport with

§ 1129(a)(11); therefore, confirmation is denied.

> **B.     Even If the Debtor's First Modified Plan Had Been Found to Be Feasible, Confirmation Would Still Have Been Denied Because the Debtor's Classification Scheme Is Unreasonable.**

The Debtor has not presented evidence that the separate classification of the unsecured

creditors represent voting interests that are "sufficiently distinct and weighty" to reasonably

require separate classes.  Section 1122 governs the way in which claims or interests are to be

classified within a Chapter 11 plan and provides that "a plan may place a claim or an interest in a

particular class only if such claim or interest is substantially similar to the other claims or

interests of such class." 11 U.S.C. § 1122(a).  "One clear rule emerges" in the courts regarding

"§1122 classification: thou shalt not classify similar claims differently in order to gerrymander

an affirmative vote on a reorganization plan."  In re Greystone III Joint Venture, 995 F.2d 1274,

1279 (5th Cir. 1991), cert. denied, 506 U.S. 821 (1992).  "The similarity of claims is determined

by their legal status in relation to the debtor"; therefore, generally, "unsecured claims will . . .

comprise one class, whether trade, tort, publicly held debt, or a deficiency of a secured creditor

because they are claimants of equal legal rank entitled to share pro rata in values remaining after

the payment of secured and priority claims."  FGH Realty Credit Corp. v. Newark Airport/Hotel

Ltd. P'ship, 155 B.R. 93, 99 (D.N.J. 1993) (finding separate class of employees' unions was

permissible because unions had additional "non-creditor interest" of employment).

The Third Circuit Court of Appeals has addressed the issue of whether similar claims could be

placed in different classes and found that "the grouping of similar claims in different classes" is

permissible and "that the classification of [such] claims or interests must be reasonable."  In re

Jersey City Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987).  Since the Jersey City Medical

decision, the Third Circuit has further addressed "the factors that should be considered in

determining whether a classification scheme is reasonable," stating that:

> [T]his determination must be informed by the two purposes that
> classification serves under the Code: voting to determine whether a
> plan can be confirmed and treatment of claims under the plan.
> Thus, where . . . the sole purpose and effect of creating multiple
> classes is to mold the outcome of the voting, it follows that the
> classification scheme must provide a reasonable method for
> counting votes. In a "cram down" case, this means that each class
> must represent a voting interest that is sufficiently distinct and
> weighty to merit a separate voice in the decision whether the
> proposed reorganization should proceed. Otherwise, the
> classification scheme would simply constitute a method for
> circumventing the requirement set out in 11 U.S.C. §1129(a)(10)[].

Route 37, 987 F.2d at 159 (citations omitted) (considering whether the debtor's plan was

reasonably confirmable in the context of a stay relief motion).  In Route 37, the proposed plan

classified the mortgagee's secured portion of its claim in a class, the mortgagee's unsecured

portion of its claim, approximately $3.7 million, in a class, and all other unsecured claims, an

estimated total of $492,000, in a class. 987 F.2d at 156.  Under the proposed plan, all unsecured

claims would receive the same treatment, including the mortgagee's unsecured claim.  Id.  After

discussing with approval several other circuit courts' decisions, the Third Circuit held that the

debtor's proposed plan "had no reasonable prospect of confirmation." Route 37, 987 F.2d at

159-61.  The Third Circuit rejected the debtor's reasoning for its classification, finding that: (1)

the debtor's reliance on the creditor's differing state law rights was not relevant for creating a

"reasonable scheme for measuring creditor's votes"; and (2) the debtor's argument that some

creditors "have an interest in voting to defeat any plan" and that such creditors' claims "would

dilute and dominate[] the vote of those truly acting in their interests as unsecured creditors" was

unpersuasive.  Id.  at 161.  Regarding the debtor's second argument, the Third Circuit noted that

"[a]bsent bad faith or illegality . . . , the Code is not concerned with a claim holder's reason for

voting one way or the other, and undoubtedly most claim holders vote in accordance with their

overall economic interests as they see them." Id.

In its March 13, 2009 supplemental brief, the Debtor cites to In re Boston Post Road Ltd.

Partnership, 21 F.3d 477, 483 (2nd Cir. 1994), for the proposition that a debtor must establish

that there is a legitimate business reason to justify a separate classification. Specifically, in

Boston Post Road, the Second Circuit Court of Appeals held that the "separate classification of

unsecured claims solely to create an impaired assenting class will not be permitted; the debtor

must adduce credible proof of a legitimate reason for separate classification of similar claims."

21 F.3d at 483. The Second Circuit found that the debtor "was unable and failed to adduce

credible proof of any legitimate reason for the separate classifications" and that the debtor's

justifications, which included the argument that the debtor's ability to continue to operate

"depend[ed] on its treating the trade creditors more favorably than the mortgagee," were

insufficient. Id. Regarding the more favorable treatment of the trade creditors argument, the

Second Circuit concluded that the debtors had not provided evidence that the trade creditors

"were essential" to the debtor's future. Id. Additionally, the Second Circuit noted that

"approving a plan that aims to disenfranchise the overwhelmingly largest creditor through

artificial classification is simply inconsistent with the principles underlying the Bankruptcy

Code. A key premise of the Code is that creditors holding greater debt should have a

comparably greater voice in the reorganization." Id.

Here, the Debtor has not presented evidence that the First Modified Plan's classification

scheme is reasonable. The First Modified Plan classifies its unsecured creditors with allowed

claims into four classes: (A) trade creditors whose claims arose in the Debtor's ordinary course

of business and whom the Debtor may continue to do business in the future; (B) trade creditors

whose claims are not related to the Debtor's ordinary business operations and that the Debtor

does not foresee a continuing business relationship; (C) creditors whose claims arose through

litigation against the Debtor, and (D) insider creditors that have intercompany loans with the

Debtor.  As discussed in Route 37 and FGH Realty, the distinctions made by the Debtor

regarding how the different claims in Classes A, B, and C arose will not be considered and are

irrelevant because the claims' legal status in relation to the Debtor, as unsecured claims, is the

focus for classification purposes.  See, e.g., Route 37, 987 F.2d at 161 (noting "'[h]ow the claims

of the [insurance company] and the trade creditors achieved their status' . . . ' does not alter their

current legal character and thus does not warrant separate classification.'").  The unsecured

creditors' classes scheduled treatments are identical, each receiving approximately 10% of their

allowed claims from up front and future payments, except Class D, which is a class exclusively

comprised of insiders.  This identical treatment makes it difficult to find the separate

classifications of these unsecured claims reasonable.  See In re Bryson Properties, XVIII, 961

F.2d 496, 502 (4th Cir.), cert. denied, 506 U.S. 866 (1992) ("Where all unsecured claims

received the same treatment in terms of the Plan distribution, separate classification . . . is, at a

minimum, highly suspect.").

　　　　The Debtor asserts several justifications for its classification scheme, but the

justifications are unpersuasive and all have been addressed in previous case law.  First, the

Debtor argues that the trade creditors in Class A include sub-contractor limousine companies and

fuel station creditors that the Debtor may continue to do business with post-confirmation.  The

Debtor asserts that it has continued to do business with at least one of the sub-contractors during

the pre- and post-petition periods.  The Debtor presents no evidence of a continued business

relationship with these creditors, and, like the debtor in Boston Post Road, the Debtor, here, has

not provided evidence that these trade creditors are essential to the Debtor's future.  Additionally,

the Debtor asserts in its motion to allow untimely ballots that Odyssey, a trade creditor listed in

Class A, did not receive notice of the Debtor's bankruptcy filing because the notice was sent to

the incorrect address.  If the Debtor is going to continue to do business with a trade creditor,

there is an assumption that the Debtor would have communicated with such a creditor between

February of 2008 and April of 2009 and that the Debtor would know the address of such a

creditor.  Since Class A's treatment is identical to the other secured creditors and the Debtor has

not provided evidence to support this separate classification, this classification is unreasonable.

The Debtor argues that Class B includes trade creditors that the Debtor will no longer do

business with post-confirmation.  In its March 13, 2009 supplemental brief, the Debtor asserts

that the creditors in this class include the Debtor's former counsel, a court reporting service, and

two individuals that purchased vehicles from the Debtor.  The Debtor's former counsel and the

court reporting service cannot be considered trade creditors, the Debtor has not presented

evidence as to why this separate classification is legitimate, and the sole fact that the Debtor will

no longer do business with these creditors is not a sufficiently distinct and weighty reason to

merit a separate class for these creditors; therefore, this separate classification is unreasonable.

For the separate classification of Class C, the Debtor asserts that Class C's unsecured

creditor, John Paone, the owner of Jonathon's Transport, has the largest claim, approximately

$297,000, which comprises about 61% of all unsecured claims eligible to vote, and that

classifying this creditor with the other unsecured creditors would grant him control over the

voting.  Courts do not find this to be reasonable justification for the separate classification of this

creditor.  See, e.g., Route 37, 987 F.2d at 159-61.  As discussed in Boston Post Road, this

creditor, because of the size of his claims, should have a comparably greater voice in the

reorganization and should not be disenfranchised by the Debtor's unreasonable classification scheme.

Additionally, the Debtor asserts that the creditor is classified into a separate class, Class C, because this creditor has a personal vendetta against the Debtor and does not want the Debtor to reorganize.  Jon Paone testified that he voted against the Debtor's reorganization because he did not believe he would be paid.  This creditor has the right to vote against the First Modified Plan, and, as stated in Route 37, the Code is not concerned with the creditor's reasons for voting one way or the other, absent bad faith or illegality.  See also Fairfield Executive Assoc., 161 B.R. at 602.  This creditor is not required to have an interest in the survival or reorganization of the Debtor and can vote for his economic interest as he so chooses.  See Id.  Because bad faith has not been established here, and the creditor has a right to vote however he so chooses, the classification of this creditor separately from other unsecured creditors is unreasonable. The Court cannot find that the separate classification of this creditor is appropriate solely to allow the Debtor the chance to reorganize.  See Greystone, 995 F.2d at 1280 (finding that policy considerations cannot justify the gerrymandering of votes).

Because the Debtor has not presented evidence to establish a viable reason for separately classifying the unsecured creditors of Classes A, B, and C, the Court concludes that these three classes of unsecured creditors should comprise one class.  Further, since the claims of Jon Paone and Jonathon's Transport are so large, and they will probably reject any plan that will not substantially pay their claims, the requirement that the plan be accepted by at least one class of impaired creditors will now not be possible for the Debtor to met pursuant to § 1126(c).

**C.**      **Further, the Debtor's New Capital Contribution Proposal Does Not Comply with the "New Value" Exception to the Absolute Priority Rule.**

Groff, Sr., as an equity holder, is in a creditors' class junior to the dissenting unsecured creditors in Classes A, B, and C, which are unsecured creditors with allowed claims that are not being fully paid; therefore, the absolute priority rule bars Groff, Sr. from retaining ownership interest in the reorganized Debtor, unless Groff, Sr. meets the requirements of the new value exception to overcome this rule.  The new value exception to the absolute priority rule "allows existing equity holders to retain (i.e., buy back) their ownership interests in the reorganized debtor over the objection of any senior dissenting unsecured creditor class that is not being paid in full if the equity holders make a new capital contribution to the debtor that meets certain criteria."  In re Haskell Dawes, Inc., 199 B.R. 867, 871 (Bankr. E.D.Pa. 1996).  A Chapter 11 plan proponent calling upon the new value exception has the burden of proving that the equity holders capital contribution is: (1) "in the form of money or money's worth"; (2) "necessary to the reorganization"; (3) "reasonably equivalent to the value of the interest being retained"; (4) "up front"; and (5) "substantial." Haskell Dawes, 199 B.R. at 872 (citations omitted).  "'A rigorous showing as to these requirements is necessary in order to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means of contrived infusion.'" In re Sea Garden Motel & Apartments, 195 B.R. 294, 301 (D.N.J. 1996) (quoting In re Tallahassee Assocs., L.P., 132 B.R. 712, 717 (Bankr.W.D.Pa.1991)).

Here, the Court finds that Groff, Sr.'s $66,000 new capital contribution does not meet all of the requirements of the new value exception because, although the contribution is in the form of money, up front, and reasonably necessary to the reorganization, the Debtor has not established that Groff, Sr.'s capital contribution is substantial and reasonably equivalent to the interest being retained in the Debtor; therefore the absolute priority rule would bar Groff, Sr.'s

proposed purchase of the reorganized Debtor's.  The Court will address each of the new value

exception requirements independently below.

1.      <u>In the Form of Money or Money's Worth</u>

The Court finds that the Debtor's proposed new capital contribution is in the form

of money.  The Debtor's principal, Groff, Sr., testified that he has refinanced personal property

in the amount of $57,000 and that his daughter is giving him an additional $9,000 for the

contribution. This $66,000 cash contribution is being held in the Debtor's attorney's trust

account until the effective date of the First Modified Plan.  The Debtor would have meet this

requirement.

2.      <u>Necessary to the Reorganization</u>

The Court finds that Groff, Sr.'s capital contribution is necessary to the reorganization

because it allows the Debtor to pay some of its administrative and unsecured creditors, enabling

the Debtor to make payments due under the First Modified Plan and continue operating.  Capital

contributions have been found to be necessary to the reorganization when the contributions:

(1) "will fund repairs or improvements to the debtor's property necessary to the reorganization"

or (2) "are necessary to enable the debtor to make payments due under the plan and continue

operating." <u>In re H.H. Distributions, L.P.</u>, Nos. 08-10700, 08-10701, 08-10707, 08-12217, 08-

12219, 2009 WL 136821, at *5 (Bankr. E.D.Pa. Jan. 16, 2009) (citing <u>Haskell Dawes</u>, 199 B.R.

at 873-74). "Merely using the funds to pay priorities and administrative claimants is not a

sufficient reason" to find a capital contribution is a "necessity" for the reorganization.  <u>In re</u>

<u>Tucson Self-Storage, Inc.</u>, 166 B.R. 892, 899 (9th Cir. BAP 1994).

Here, although Groff, Sr.'s capital contribution proposal initially intended for the funds to

solely pay administrative claims, in the Debtor's February 12, 2009 supplemental brief, the

Debtor revised the capital contribution proposal to allow for a $10,000 payment to unsecured claims, with the remaining $56,000 to still be paid to administrative claims. The capital contribution will reduce scheduled future payments to unsecured creditors but will increase the future payments to administrative creditors.  Groff, Sr.'s capital contribution will not provide working capital for the Debtor's business operation and will not be used for improvements or repairs of the Debtor's property; but, without the capital contribution, the Debtor asserts it will not be able to confirm a plan because the Debtor will not be able to comply with § 1129(a)(9) and will be unable to continue operation, which is necessary to make the scheduled future payments to the creditors under the First Modified Plan.  Since the Debtor does not have the cash or the assets to survive without this capital contribution, the contribution can be considered more than just a mere payment of administrative claims.  The new capital contribution proposal allows the Debtor to pay some of its administrative and unsecured creditors, enabling the Debtor to make payments due under the First Modified Plan and continue operation; therefore, the Debtor would have meet the "necessary to the reorganization" requirement to the new value exception.

### 3.    Reasonably Equivalent to the Interest Being Retained

The Debtor has not provided the Court with evidence that Groff, Sr.'s new capital contribution is reasonably equivalent to the interest being retained.  "[T]he 'reasonably equivalent' requirement safeguards the integrity of the absolute priority rule by preventing equityholders from retaining their equity interest in a debtor at the expense of the dissenting, impaired unsecured creditors."  Haskell Dawes, 199 B.R. at 877.  For this determination, a debtor needs to establish the value of the reorganized entity.  H.H. Distributions, 2009 WL 136821, at *6.  "The generally accepted method for establishing enterprise value is the capitalization of future earnings"; which "entails an earnings projection discounted to present

value on the basis of a capitalization rate that reflects the expected annual rate of return that investors would require on an investment of comparable risk." Id. (citing Haskell Dawes, 199 B.R. at 877-79). Personal benefits such as salaries received from a debtor, which are retained by equity through the continued ownership of a debtor, have also been considered "additional value to equity holders." Haskell Dawes, 199 B.R. at 879.

Here, pursuant to the Debtor's First Modified Plan, Groff, Sr. is to retain ownership of the Debtor in exchange for his $66,000 capital contribution. Because the Debtor has not established its reorganized value nor has the Debtor explained whether personal benefits, such as salaries, will eventually be received by Groff, Sr., the Court cannot determine whether Groff, Sr.'s new capital contribution is reasonable equivalent value to the interest being retained. The Debtor, in its February 12, 2009 supplemental brief, asserts, since Groff, Sr. does not receive a salary from the Debtor, the total projected net cash flow of the Debtor over a five-year period is the only source of revenue for Groff, Sr.'s investment in the Debtor. The Debtor then compares the total yield of this investment with the yield Groff, Sr. would receive if he invested the $66,000 in a CD for five years – an investment that does not involve a comparable risk to the investment in the Debtor's operation. Although the Debtor presented future earnings projections, the Debtor did not discount the projections to present value on the basis of a capitalization rate that reflects the expected annual rate of return investors would require on an investment of comparable risk. Without the second step of this analysis, the Court cannot conclude that Groff, Sr.'s capital contribution is reasonably equivalent to the interest retained in the Debtor; therefore the Debtor would fail to meet this requirement of the new value exception. See Haskell Dawes, 199 B.R. at 879 (listing courts that have found, without second step of analysis, that conclusion of whether a capital contribution was reasonably equivalent to interest retained could not be made).

4.    Up Front Contribution

The Court finds that the Debtor intended to make an up front new capital contribution of

$66,000 on the effective date of the First Modified Plan. A new capital contribution, for the

purposes of the new value exception, "must be a present contribution, taking place at or before

the effective date of the plan, not a contribution in the future," and "is essential so that it may be

liquidated by the creditors should the reorganization effort fail." In re Sovereign Group, 142

B.R. 702, 709 (E.D.Pa. 1992) (citations omitted).  Here, the $66,000 capital contribution from

Groff, Sr. can be considered an up front contribution.  The future payments that are scheduled to

be paid to the unsecured creditors are not included in this determination.  The $66,000 new

capital contribution is being held in the Debtor's attorney's trust account until the effective date

of the First Modified Plan and then $10,000 is to be paid to the unsecured creditors and $56,000

is to be paid to administrative creditors. Groff, Sr.'s $66,000 capital contribution meets the up

front requirement of the new value exception.

5.    Substantial Contribution

Since the amount of Groff, Sr.'s new capital contribution that is actually being paid to

unsecured creditors is nominal, the Court finds that the contribution is not substantial.  Although

"[t]here is no mathematical formula for resolving the substantiality issue," In re Snyder, 967

F.2d 1126, 1131-32 (7th Cir. 1992), when reviewing the substantiality of a capital contribution,

"'a court must compare the contribution to the total prepetition claims and the amount of the

debt to be discharged under the [p]lan.'" Sea Garden Motel, 195 B.R. at 302 (quoting In re

Resorts Int'l, Inc., 145 B.R. 412, 483 (Bankr. D.N.J. 1990)).  "A contribution that is a 'merely

nominal, or gratuitous, token cash infusion[ ] proposed primarily to buy cheap financing' does

not qualify as substantial."  In re Elmwood, Inc., 182 B.R. 845, 852 (D. Nev. 1995) (quoting

Snyder, 967 F.2d at 1131).  Other courts have found that "whether the payment proposed represents the Debtor's best effort is the proper focus in a case involving a debtor who is an individual or is made up of a small group of interest holders." In re Capital Ctr. Equities, 144 B.R. 262, 269-270 (Bankr. E.D.Pa. 1992).  Further, courts have examined whether "'creditors will share in the potential growth of the newly capitalized debtor, or whether the shareholder's new equity position will have the potentiality of only benefitting the shareholders under the plan.'" Sea Garden Motel, 195 B.R. at 302 (quoting In re Resorts Int'l, Inc., 145 B.R. 412, 483 (Bankr. D.N.J. 1990)).

Here, Groff, Sr. is contributing $66,000 to the Debtor for his new capital contribution, with only $10,000 of that contribution being paid to the unsecured creditors.  With the total pre-petition claims totaling approximately $500,000, the Debtor's contribution being paid toward such claims only equates to about 2% of the total pre-petition claims – a nominal amount.  The Court does not find that this contribution is substantial enough to allow the Debtor's principal to retain ownership of the Debtor and overcome the dissenting voices of the senior class of unsecured creditors.

Additionally, because Groff, Sr. is the Debtor's sole member, the Debtor should have also established whether the payment proposed represents Groff, Sr.'s best effort.  The Debtor did not present evidence regarding whether this was or was not Groff, Sr.'s best effort; therefore the Court cannot make a finding on this issue.

Finally, the Debtor does not include in its treatment of unsecured creditors the potential for the unsecured creditors to receive increased future payments or benefits from the Debtor even if the Debtor has a significant growth in business, thus Groff, Sr.'s new equity position will potentially solely benefit him.  The Debtor does provide in the First Modified Plan the

possibility of the creditors receiving funds recovered from ongoing litigation that the Debtor is pursuing, but the Debtor has presented no evidence regarding the viability of such causes of action.  These treatments of the creditors do not weigh in favor of the finding that Groff, Sr.'s contribution is substantial.

In sum, because the Court concludes that Groff, Sr.'s $66,000 new capital contribution does not meet all of the requirements of the new value exception, specifically, the requirements that Groff, Sr.'s capital contribution be substantial and reasonably equivalent to the interest being retained in the Debtor, the Court finds that Groff, Sr.'s retention of the reorganized Debtor would violate the absolute priority rule.

> **D.    The Untimely Voting Ballots of the Creditors Cannot Be Allowed Because the Ballots Were Filed Four Months After the Voting Deadline and the Confirmation Record Has Been Closed for Weeks.**

Federal Rule of Bankruptcy Procedure 3018(a) governs whether a court may allow a creditor to change or withdraw an acceptance or rejection of a plan.  In re Gulfstar Indus., Inc., 236 B.R. 75, 78 (M.D.Fla. 1999) (finding "the Bankruptcy Court's use of Rule 3018(a) was correct because it was, and is, the appropriate law to follow on the issue of acceptance of untimely filed ballots").  Rule 3018(a) provides that:

> A plan may be accepted or rejected in accordance with § 1126 of the Code within the time fixed by the court pursuant to Rule 3017. . . .  For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.

Fed. R. Bankr. P. 3018(a).

The Debtor argues that both Odyssey and Absecon Shell, unsecured creditors grouped in Class A, should be allowed to file their ballots, which will accept the Debtor's First Modified Plan, because the creditors' failure to act was the result of excusable neglect— that Odyssey was

not properly noticed regarding the Debtor's bankruptcy and that Absecon Shell's attorney was out of the country during the voting period; therefore, the ballot deadline was unintentionally missed.  Additionally, at the April 27, 2009 hearing, the Debtor argued that these untimely ballots would support the confirmation of the First Modified Plan if the Court allowed the Debtor's proposed classification scheme to stand, or if the Court determined that Class A and Class B should be combined.  The Debtor admitted that if the Court found that the Debtor's classification of unsecured creditors should be grouped into one class, the untimely ballots would not assist the Debtor.

Here, almost four months after the voting deadline of December 15, 2008 and weeks after the confirmation hearing record was closed, the Debtor files a motion requesting the acceptance of untimely voting ballots, arguing that the untimely ballots were due to excusable neglect.  The Debtor is not requesting that the Court allow the creditors to change or withdraw a ballot pursuant to Rule 3018(a) but to actually cast a ballot. The Court finds that the untimely ballots will not be accepted under Rule 3018(a).  See Gulfstar, 236 B.R. at 78 (finding the bankruptcy court's conclusion that a ballot filed 11 days after the voting deadline would not be counted was appropriate); In re Motel Assoc. of Cincinnati, 50 B.R. 196, 199-200 (Bankr. S.D.N.Y. 1985); In re Salem Bank Bldg Ltd. P'ship, 40 B.R. 574, 575 (Bankr. W.D.Va. 1983).

Even if the Court allowed the untimely ballots of Odyssey and Absecon Shell, ballots which will accept the First Modified Plan, because the Court finds that Classes A, B, and C should comprise one class, as discussed in Section III.B. above, that one class will not become an accepting impaired class for the purposes of § 1129(a)(10) – even with the addition of these ballots.

32

## IV.    CONCLUSION

After considering the testimony of the witnesses at the confirmation hearing for the

Debtor's First Modified Plan, the evidence presented to the Court, and the pleadings of the

parties, the Court concludes that the Debtor's First Modified Plan does not meet the feasibility

requirements of § 1129(a)(11); therefore, the confirmation of the Debtor's First Modified Plan is

denied.  Additionally, the Court finds that even if the Debtor's First Modified Plan was feasible,

it does not reasonably classify unsecured creditors into voting classes and is barred by the

absolute priority rule.

Further, the Court concludes that the Debtor's motion regarding the untimely filed ballots

is denied because the Court finds that the ballots were filed almost four months after the voting

deadline.


BY THE COURT:


GLORIA M. BURNS
United States Bankruptcy Judge


Dated:   May 7, 2009